Jonathan A. Dessaules, Arizona Bar No. 019439
**DESSAULES LAW GROUP**
7243 North 16th Street
Phoenix, Arizona 85020
Tel. 602.274.5400
Fax 602.274.5401
jdessaules@dessauleslaw.com

*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| American Professional Agency, Inc., | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Juggernaut Innovations, LLC, a/k/a Juggernaut Holding, | |
| Defendant. | |

Plaintiff American Professional Agency, Inc., by its attorneys, Dessaules Law Group, for its Complaint against Defendant Juggernaut Innovations LLC a/k/a Juggernaut Holding, alleges:

**Nature of this Action**

1.      Plaintiff seeks damages arising from Defendant's wholesale failure to meet its basic contractual obligations under an agreement to transform Plaintiff's paper-based insurance business processes into the digital age.

2.      As part of this transformation project, Defendant was to develop a fully functional, modern website for Plaintiff's insurance business. Plaintiff contracted with Defendant for Defendant to build Plaintiff a website that would serve as an effective marketing tool, capture leads, provide information on product features, provide prospective clients with "get-a-quote" functionality for insurance premiums, and enable clients to complete and submit their insurance applications online.

3.      Despite Plaintiff's regular monthly payments under the contract, Defendant was

either chronically late in meeting its scheduled deliverables or failed to complete contractually obligated work. Defendant's failure to timely meet scheduled deadlines and substantive problems with its work product was pervasive.

4. Defendant failed to provide what the parties agreed, despite Plaintiff paying Defendant over $1 million during the 17-month long website and software development period.

5. At the end of the day, after paying Defendant over $1 million, Plaintiff never transitioned from the deficient beta testing website it built and deployed to a fully functional website.

6. In fact, as a result of persistent problems with Defendant's computer code and repeated complaints from Plaintiff's staff and clients, Plaintiff was forced to take down the beta website.

7. Plaintiff suffered significant damages due to Defendant's material breaches of its contractual obligations to Plaintiff. Plaintiff's damages include amounts paid to Defendant for an unusable website, money paid to another information technology vendor to attempt to troubleshoot and remedy Defendant's unusable work product, and lost profits from Defendant's failure to deliver to Plaintiff what it promised: fully functional, state of the art, digital business processes using a modern, easy to navigate website.

## The Parties

8. Plaintiff American Professional Agency, Inc. (APA) is a New York corporation with its principal place of business at 95 Broadway, Amityville, New York 11701. APA is a citizen of the State of New York for jurisdiction diversity purposes.

9. Upon information and belief, Juggernaut Innovations LLC a/k/a Juggernaut Holding (Juggernaut) is a New Jersey limited liability company with its principal place of business in Arizona at 4040 East McLellan Road, Unit 8, Mesa, Arizona 85205. Juggernaut is a citizen of Arizona and New Jersey for jurisdiction diversity purposes.

## Jurisdiction and Venue

10.    This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States.

11.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) & (2). Defendant Juggernaut resides in this judicial district, and a substantial part of the events giving rise to the claim occurred in this judicial district.  In addition, the agreement that is the subject of this civil action provides for exclusive venue in Maricopa County, Arizona.

## Factual Background

### APA Is a Leader in Professional Liability Insurance for Mental Health Professionals

12.    APA's predecessor company was founded over eight decades ago and began its operations in New York City in 1940.  In 1972, APA moved its offices to its present location in Amityville, New York.

13.     APA's business focuses on professional liability insurance, specializing in mental health professionals, such as counselors, social workers, psychologists, psychiatrists, and marriage and family therapists.

14.    APA has grown to be one of the largest mental health professional liability insurance writers in the United States.  APA has approximately 100,000 policyholders, ranking APA in the country's top 100 insurance brokerages.

15.    APA is unique in the mental health professional liability insurance market because it is a Managing General Agent (MGA).  As an MGA, APA acts under the insurance carrier's authority to quote, bind and sell insurance, subject to agreed-upon underwriting guidelines.

### Juggernaut Advertises It Has the Skill and Experience to Deliver Digital Products and Services Accurately and Quickly

16.    Upon information and belief, Juggernaut is a software and website development

3

company.

17.    Juggernaut promotes its unique software and website development process: "Transform your development process with AI-powered project management. Build MVPs [Minimum Viable Products] and POCs [Proof of Concepts] faster than ever using our proven methodology."[1]

18.    Juggernaut also promotes to potential clients the speed with which it can develop and deliver its products: "Comprehensive tools designed to streamline your development process and accelerate project delivery. Our feature-rich platform combines cutting-edge AI automation with proven project management methodologies to deliver exceptional results for teams of all sizes…. Speed: Reduce development time by up to 70% with AI-powered automation."[2]

19.    Juggernaut emphasizes the quality of its coding: "Quality: Maintain high code quality with automated reviews and testing workflows" with Juggernaut.[3]

20.    As demonstrated below, Juggernaut failed to deliver code quality with any speed. Juggernaut's code quality ranged from poor to useless, and Juggernaut was consistently late in meeting its contractually mandated deadlines.

**Juggernaut's Evaluation Concluded APA
Had an Outdated Workflow Process and Website**

21.    At the time APA hired Juggernaut, APA used manual, paper-based computer applications.

22.    Use of these paper-based computer applications led to delays in processing insurance applications and lost business leads.

23.    APA had extremely limited online insurance premium quote functionality, which made it more difficult for APA's clients and potential clients to evaluate the value of the products

[1] https://juggernautdev.com/ (last viewed September 16, 2025).
[2] *Id.*
[3] *Id.*

4

and services provided by APA.

24.     Also, APA's systems operated in "silos."  They did not communicate with each other effectively, which slowed down APA's operations.

25.     Finally, APA's website was outdated.  It did not meet modern usability standards or performance expectations and was incompatible with mobile phones.

26.     APA needed a digital transformation in the way it conducted its operations and communicated with its clients.

### APA Hires Juggernaut to Investigate and Evaluate APA's Business Operations and Competitive Position in Its Market

27.     Juggernaut divided its work into two phases.  A separate agreement governed each phase.

28.     An Independent Contractor Agreement (the ICA) dated August 15, 2023, between APA and Juggernaut governed the first phase of Juggernaut's work.  A copy of the ICA is attached as Exhibit 1.

29.     Under the ICA, Juggernaut agreed to complete the project by providing the services outlined in Schedule A to the ICA.  (Exhibit 1, ¶ 2).  Schedule A was the first phase of Juggernaut's work.

30.     In the first phase, Juggernaut was to investigate and understand APA's business operations, workflows, client communications, and competitive market position.  (*See* Exhibit 1, Schedule A).

31.     Juggernaut's work in the first phase was in preparation for implementing and executing a plan (the second phase) to modernize and improve each of those aspects (business operations, workflows, client communications) of APA's business.  (*See* Exhibit 1, Schedule B).

32.     The work, outcomes, and findings under the ICA would determine the scope of Juggernaut's second phase of work.  (*See* Exhibit 1, ¶ 2).

33.     By its terms, the ICA ended four months later on December 15, 2023, unless it was

extended on a month-to-month basis by written notice from APA to Juggernaut.  (*Id*., ¶ 3).

34.    APA did not extend the ICA's four-month term by written notice from APA to Juggernaut.

35.    The ICA provided that APA would pay Juggernaut a fee of $40,000 per month for Juggernaut's work under the ICA.  (I*d*., ¶ 5).

36.    APA paid Juggernaut $40,000 per month, for a total of $160,000, over the ICA's four-month term.

37.    Juggernaut represented and warranted to APA that Juggernaut was able to perform what the ICA required of it.  (*See id*., ¶ 6).

38.    Finally, the ICA provided that APA was the sole and exclusive owner of all work created by Juggernaut under the ICA.  (*See id*., ¶ 9).

39.    APA performed its contractual obligations under the ICA in full.

### APA Hires Juggernaut to Modernize and Improve APA's Business Operations and Client Communications and Experience

40.    A Software Development Agreement (the SDA) between APA and Juggernaut, dated December 1, 2023, governed the second phase of Juggernaut's work.  A copy of the SDA is attached as Exhibit 2.

41.    APA viewed the ICA and the SDA as a single integrated contract, since APA would not have hired Juggernaut to perform the services under the ICA unless it could deliver what it promised in the SDA.

42.    Under the SDA, Juggernaut was to provide the software development services listed in Schedule A to improve and modernize APA's business operations, workflows, and customer experience.  (*See* Exhibit 2, ¶ 2 and Schedule A).[4]

43.    As part of its services, Juggernaut was to overhaul APA's outdated website and

---

[4] Although paragraph 2 of the SDA mentions a Schedule A and Schedule B, the SDA contains only a Schedule A.

develop and implement a modern website with a customer portal for APA. The new website was to provide existing and prospective clients with "get-a-quote" functionality and include the ability for APA's clients to complete and submit their insurance applications online.

44. By its terms, the SDA ran 13 months, from December 1, 2023 to December 31, 2024.

45. Similar to the ICA, the SDA terminated by its terms on December 31, 2024 unless it was extended on a month-to-month basis by written notice from APA to Juggernaut.

46. APA did not extend the SDA's 13-month term by written notice from APA to Juggernaut.

47. The SDA's paragraph 5 and Schedule A set forth the payments from APA to Juggernaut for the work.

48. The estimated cost of Juggernaut's work under the SDA was $744,000.

49. APA paid Juggernaut a total of $913,000 under the SDA.

50. The total sum APA paid Juggernaut for its work under the ICA and SDA was $1,073,000.

51. Like the ICA, Juggernaut represented and warranted to APA in the SDA that Juggernaut was able to perform the required services under the SDA. (*See* Exhibit 2, ¶ 6).

52. Finally, like the ICA, the SDA provided that APA was the sole and exclusive owner of all work created by Juggernaut under the SDA:

> All work on the Project rendered by [Juggernaut] and results thereof, including all materials, and concepts expressed therein or created in their reproduction, shall be the sole and exclusive property of [APA] and [APA] shall have all rights whatsoever therein, including the full right to their use for any purpose and in any media throughout the world and to copy, publish, patent, trademark, and distribute the same as [APA] may deem appropriate, without payment except as provided in Point 5 above.[5] If for any reason the material created by [Juggernaut] shall be deemed

---

[5] "Point 5 above" refers to the SDA's payment and expense reimbursement paragraph. This paragraph does not condition APA's ownership of the material created by Juggernaut to APA's payments to Juggernaut. In any event, APA paid Juggernaut almost $200,000 over what was required in the SDA. (*See* Exhibit 2, ¶ 5).

not to be a "work for hire", this Agreement shall constitute an assignment by [Juggernaut] to [APA] of all rights of copyright. (*See id*., ¶ 9).

53.     APA performed its contractual obligations under the SDA in full.

**Juggernaut Failed to Deliver What It Promised under the SDA**

54.     Juggernaut was unable to deliver a complete website with the promised functionalities.

55.     This inability caused the website's launch date to be pushed back multiple times.

56.     Juggernaut's work under the SDA was deficient in a number of material respects.

57.     First, Juggernaut failed to deliver to APA a shared timeline and plan for the development of the project's features. Without a shared timeline, APA could not track progress and hold the various teams working on the project accountable to their deadlines.

58.     Second, Juggernaut failed to employ the agreed upon Scrum framework for the project's management.

59.     The Scrum framework is a flexible, iterative methodology for managing complex product development. It breaks down the project's work into short, time-boxed periods called Sprints. Sprints are short, iterative cycles (typically one month or less) during which a usable product increment is developed. Key aspects of the Scrum framework for project management include daily meetings (or Daily Scrums) to synchronize the project team, sprint reviews to demonstrate work and gather feedback, and a Scrum Master to facilitate the process and remove impediments.

60.     Here, Juggernaut failed to deliver future sprint planning in the management of the project.

61.     Sprint planning is an important event in the Scrum framework. Sprint planning is where the project team determines the product backlog items they will work on during that Sprint and discuss their initial plan for completing those product backlog items.

62.     Third, Juggernaut failed to set up and train APA's staff on HubSpot.

8

63.     HubSpot connects various business functions.  HubSpot is an AI-powered customer platform that provides a unified, centralized system for business marketing, sales, customer service, operations, and content management, all built on a core Customer Relationship Management system.

64.     In APA's case, HubSpot was to market insurance products, take in and process insurance applications, provide insurance premium quotes, bind insurance, and accept policy premium payments.  HubSpot connects various business functions and data into a single system of records, which allows companies to grow by creating better customer experiences. The HubSpot platform offers a suite of paid "Hubs" for different business functions, which can be used individually or bundled together.

65.     Juggernaut failed to set up APA's document hub as designed.  Some private documents from insureds were not to be accessible to all of APA's team members.  Juggernaut could not provide this critical feature to prevent certain APA team members from accessing certain sensitive documents.  This failure could have led to the improper release of sensitive information.

66.     Fourth, Juggernaut failed to create a digital brochure.

67.     For APA, a digital brochure is a downloadable branded summary of insurance coverage options, benefits, and differentiators, *i.e.*, unique characteristics, qualities, or features about APA's products and services that make APA stand out from its competitors to the target audience and give APA an advantage in the customer's choice and, thus, influence customer choice favorably to APA.

68.     A digital brochure is a key component for website visitors who are not ready to request an insurance premium quote or fill out an insurance application.

69.     The digital brochure would create a low-friction lead capture opportunity for APA. The low-friction lead capture opportunity from a digital brochure is a marketing tactic designed to collect a potential customer's information with minimal effort required on the customer's part.

The less friction or resistance a person encounters, the more likely they are to convert from a website visitor into a business lead.

70. Fifth, and most critical, Juggernaut failed to create and develop a digital insurance application that could be signed and submitted electronically for processing.

71. The digital insurance application was the central piece of the project. However, it was sidelined when Juggernaut encountered problems with APA's backend system, which used IBM's AS400 for its integrated server.

72. This failure resulted in the digital insurance application being deferred to a "phase 2" of this second phase of the overall project, although Juggernaut never presented a timeline for a phase 2 under the SDA.

73. Juggernaut's failure to develop the digital insurance application meant that there was no way for prospective customers to apply for insurance coverage online.

74. This failure forced users into outdated workflow processes using PDF downloads, manual data entry for APA staff, and increased phone calls and emails.

75. As a result, the insurance application process remained friction-heavy, leading to drop-offs in customer leads created by the website.

76. Digital insurance applications were to be designed to enforce required information fields, validate customer information inputs, and integrate with APA's backend IBM AS400 system.

77. The digital application was to reduce application errors and speed up application processing. Indeed, without this digital insurance application, APA's marketing team had no direct path to converting customer leads into sales.

78. A marketing campaign loses its "punch" when the marketing call-to-action on the website leads to a clunky, friction-heavy customer experience.

79. Finally, Juggernaut never delivered any wireframes for the project.

80. A wireframe is a basic, skeletal plan or blueprint for a digital product, such as a

10

website or mobile application, which shows the structure, layout, and content placement without using detailed visual designs, colors, or images. Wireframes are a low-fidelity tool to communicate ideas, organize content, define functionality, and identify potential user experience issues early in the design process. Wireframes are a fundamental first step in digital product development.

81. This failure negatively impacted internal customer management, since wireframes are the blueprints for APA's workflows, which APA's teams need for efficiency.

82. The above items are just some of the many significant failures of Juggernaut to comply with its contractual obligations under the SDA.

### At the End of the SDA Term, Juggernaut Agrees To Work for Free Until the Project Is Completed

83. By the fall of 2024, the last months of the SDA term, Juggernaut's shortcoming and project failures became obvious, even to Juggernaut.

84. As these problems mounted, APA hired 3Linc, another technology firm, to troubleshoot and work with Juggernaut in a final attempt to complete the work under the SDA.

85. Because of Juggernaut's obvious failure to meet its contractual obligations, on October 8, 2024, Juggernaut's principal told APA that he "will not bill [APA] another penny until it's done."

86. Juggernaut's position – that it would not invoice APA until it completed the project – was reaffirmed in writing on January 17, 2025, with APA contact Trish Sheehan and again on April 1, 2025, when Juggernaut stated via Google chat, "we haven't even billed anything in months on purpose."

87. After the SDA's term expired, Juggernaut attempted to fix the accumulated deficient work from January 2025 to April 2025.

88. APA paid 3Linc over $100,000 to help Juggernaut with its work under the SDA and website development.

11

89.     APA saw that Juggernaut was incapable of delivering on the SDA and decided to scale down the project and launch a minimal beta website with Juggernaut's written code and the help of APA's other software development company, 3Linc.

90.     However, even that minimal website using Juggernaut's written code and architecture had to be taken down because of persistent problems with Juggernaut's code and repeated complaints from APA staff and customers.

91.     Incredibly, two months after parting ways, Juggernaut had its attorney send a letter to APA demanding an additional $240,000 for its work from January 2025 through April 2025.

92.     In Juggernaut's demand letter, its attorney had the temerity to claim that the "project was successfully completed in May 2025."

**FIRST CLAIM**
**(Breach of Contract)**

93.     APA repeats and realleges each of the allegations contained in paragraphs 1 through 92 above, as if fully set forth herein.

94.     The ICA and SDA were valid and binding contracts between APA and Juggernaut.

95.     APA performed all of its obligations under the ICA and SDA.

96.     As set forth above, Juggernaut materially breached the ICA and SDA by, *inter alia*, failing to:

    a.     Deliver a shared timeline and plan for the development of the project's features;

    b.     Employ the agreed Scrum framework for the project's management;

    c.     Set up and train APA's staff on HubSpot;

    d.     Create a digital brochure;

    e.     Create and develop a digital insurance application that could be signed electronically; and

    f.     Deliver any wireframes for the project.

97.    As a result of Juggernaut's many material breaches of the ICA and SDA, APA has suffered and will continue to suffer substantial monetary damages including but not limited to the funds APA paid to Juggernaut, the funds APA paid to 3Linc to correct Juggernaut's defective work, and APA's lost profits resulting from the aborted marketing plan and failed digital transformation of APA's business operations.

98.    By reason of the foregoing, APA is entitled to damages in an amount to be determined at trial, but no less than $2,000,000, plus costs, expenses, and applicable interest as provided by law.

**ALTERNATIVE SECOND CLAIM[6]**
**(Unjust Enrichment)**

99.    APA repeats and realleges each of the allegations contained in paragraphs 1 through 98 above, as if fully set forth herein.

100.    Juggernaut was enriched by its receipt of funds from APA.

101.    APA was impoverished by its payments to Juggernaut of $1,073,000.

102.    In exchange for its payments to Juggernaut of over $1 million, APA received little more than snippets of unusable computer code, which was vastly different from the state-of-the-art website with the promised functionalities.

103.    This enrichment and impoverishment are connected in that APA paid the aforementioned sum to Juggernaut with the expectation that Juggernaut would deliver a modern website with the expected functionalities.

104.    The promised website was not built and deployed, but Juggernaut nonetheless kept APA's payments.

105.    In light of the fact that APA received little, if anything, of value from Juggernaut, while Juggernaut received a hefty sum of money from APA, there is no justification for this

---

[6] This second claim for unjust enrichment is plead in the alternative in the unlikely event the ICA and SDA are determined not to be valid contracts.

impoverishment and enrichment, respectively.

106.    If the above breach of contract claim is found to be inadequate, Juggernaut will still be unjustly enriched, with no remedy at law to bring the parties to parity.

107.    If the above breach of contract claim is found to be inadequate, it would be unjust for Juggernaut to retain the $1,073,000 APA has paid to Juggernaut.

108.    By reason of the foregoing, APA has suffered damages in the amount of $1,073,000, plus costs, expenses, and applicable interest as provided by law.

WHEREFORE, Plaintiff American Professional Agency, Inc. demands judgment:

A.    On its First Claim for breach of contract, awarding Plaintiff damages in an amount to be determined at trial, but no less than $2,000,000, plus applicable interest as provided by law;

B.    On its Second and Alternative Claim for unjust enrichment, awarding Plaintiff damages in the amount of $1,073,000, plus applicable interest as provided by law;

C.    Awarding APA its costs and expenses incurred in this action; and

D.    Granting APA such other and further relief as this Court deems just and proper.

DATED this 9th day of October 2025.

DESSAULES LAW GROUP


By: /s/ Jonanthan A. Dessaules
Jonathan A. Dessaules
DESSAULES LAW GROUP
7243 North 16th Street
Phoenix, Arizona 85020
*Attorney for Plaintiff*

14